Amy M. Samberg (#013874)
Amy L. Stein (#026113)
FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
One Arizona Center
400 E. Van Buren Street, Suite 550
Phoenix, AZ  85004
Telephone:  (602) 926-9880
Facsimile:  (312) 863-5099
E-Mail: asamberg@fgppr.com
        astein@fgppr.com
Attorneys for Defendant Illinois Union Insurance Company, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| London Bridge Resort, LLC, an Arizona limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Illinois Union Insurance Company, Inc., an Illinois corporation,<br><br>Defendant. | No. 3:20-cv-08109-GMS<br><br>**DEFENDANT ILLINOIS UNION INSURANCE COMPANY'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FRCP 12(B)(6)** |

Defendant Illinois Union Insurance Company ("Illinois Union"), hereby moves to dismiss Plaintiff London Bridge Resort, LLC's ("London Bridge") Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6).  In support of its Motion, Illinois Union states the following.

**PRELIMINARY STATEMENT**

In this Action, London Bridge seeks insurance coverage from Illinois Union for business income losses London Bridge has allegedly sustained as a result of the COVID-19 pandemic.  At issue is a Premises Pollution Liability Policy issued to London Bridge by Illinois Union.  London Bridge seeks coverage under the insuring agreement of the Policy which, subject to all of its terms and conditions, provides coverage for "loss" resulting from "first-party claims" arising out of a "pollution condition" on, at, under or migrating from a

"covered location." London Bridge's Complaint fails to state a viable claim for coverage for two distinct reasons.

First, COVID-19 does not constitute a "pollution condition" under the Illinois Union policy. The term "pollution condition," as defined by the policy, is limited to traditional environmental pollution, and does not include a communicable disease caused by a virus, like COVID-19. Because there is no "pollution condition," London Bridge's Complaint fails to state a claim upon which relief can be granted under FRCP 12(b)(6).

Second, even if COVID-19 did constitute a "pollution condition," there still must be "loss" resulting from "first-party claims" arising out of a "pollution condition" on, at, under or migrating from a "covered location" in order for the insuring agreement to be triggered. London Bridge's Complaint does not contain an allegation that COVID-19 was on, at, under or migrating from the "covered location" identified by the Illinois Union policy as the resort owned and operated by London Bridge in Lake Havasu City, Arizona. Because London Bridge has not claimed or alleged that COVID-19 was located at the London Bridge resort, it cannot satisfy the insuring agreement of the Illinois Union policy irrespective of whether COVID-19 is a "pollution condition." The Complaint fails to state a claim upon which relief can be granted for this reason as well.

Because London Bridge does not and cannot state a viable claim upon which relief can be granted against Illinois Union, pursuant to FRCP 12(b)(6) its Complaint must be dismissed with prejudice.

## BACKGROUND

### A.  Allegations of the Complaint

In its Complaint, London Bridge alleges that it is a destination resort in Arizona (the "Resort") and that due to the COVID-19 pandemic, its guests have either canceled prior reservations at the Resort or have elected not to travel there, severely impacting London Bridge's revenue. Complaint at ¶¶ 9-10.

The Complaint alleges that Illinois Union issued Premises Pollution Liability Insurance Policy number PPL G71205162 002 (the "Policy") to London Bridge for the

1  policy period of November 15, 2019 to November 15, 2020, providing coverage in relevant
2  part for "business interruption loss" up to $1 million arising out of a "pollution condition."
3  *Id.* at ¶¶ 11-12. The Complaint further alleges that the Policy provides coverage for
4  "business interruption loss" resulting from certain acts of civil authority arising out of a
5  "pollution condition," which the Policy identifies as "government action" and
6  "environmental law." *Id.* at ¶ 13. London Bridge alleges that COVID-19 constitutes a
7  "pollution condition" under the Policy, and that certain acts by various governmental
8  agencies with respect to COVID-19 constitute a "claim" under the Policy, which has caused
9  London Bridge to suffer approximately $2 million in "business interruption losses." *Id.* at
10 ¶¶ 14-16, 18-162.

   Count I of the Complaint alleges breach of contract. London Bridge alleges that the
12 COVID-19 pandemic has caused a covered "pollution condition" under the Policy for which
13 coverage should be afforded. *Id.* at ¶¶ 164-172. Count II is for declaratory relief, seeking
14 a declaration of coverage under the Policy. *Id.* at ¶¶ 174-177.

### B. The Policy

16 Illinois Union issued the Policy, designated as Premises Pollution Liability Insurance
17 Policy number PPL G71205162 002, to London Bridge, providing claims made and
18 reported coverage with a "policy period" from November 15, 2019 through November 15,
19 2020. (A true and correct copy of the Policy is attached hereto as Exhibit "A" bates labeled
20 IUIC000001-42). As is relevant to this case,[1] the Policy has a limit of liability of
21 $1,000,000 per "pollution condition" and a $1,000,000 total policy and program aggregate
22 for all "pollution conditions", subject to a self-insured retention of $100,000 per "pollution
23 condition." *Id.* at IUIC000002.

24 Coverage A of the Policy provides, in pertinent part, that it will pay "loss" in excess
25 of the "self-insured retention" for:

---

[1] Subject to all of its terms and conditions, the Policy also provides coverage for an "indoor environmental condition," which is not at issue in the Claim or the Complaint.

> "Claims" and "first-party claims" arising out of: **1)** a "pollution condition" on, at, under or migrating from a "covered location"… provided the "claim" is first made, or the "insured" first discovers the "pollution condition" … that is the subject of such "first-party claim", during the "policy period". Any such "claim" or "first-party claim" must be reported to the Insurer, in writing, during the "policy period" or within thirty (30) days after the expiration of the "policy period", or during any applicable "extended reporting period".

*Id.* at IUIC000006. Importantly, the Insuring Agreement not only requires the discovery during the policy period of a "pollution condition" as that term is defined, the "pollution condition must be "<u>on, at, under or migrating</u> from a 'covered location.'"  (Emphasis added). *Id.* There is one "covered location," which is the Resort located at 1477 Queens Bay, Lake Havasu City, Arizona. *Id.* at IUIC000002.

A "pollution condition" is defined as:

> The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level" radioactive waste", "mixed waste" and medical, red bag, infectious or pathological wastes, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

*Id.* at IUIC000014-15.

If the requirements of the Insuring Agreement and all other terms and conditions have been met, the Policy will pay covered "loss." "Loss" includes "remediation costs" "emergency response costs", and, as is relevant to this case, "business interruption loss." *Id.* at IUIC000013. The Policy defines "business interruption" as:

> [T]he necessary partial or complete suspension of the "insured's" operations at a "covered location" for a period of time, which is directly attributable to a "pollution condition" or "indoor environmental condition" to which Coverage **A.** of this Policy applies. Such period of time shall extend from the period of time that the operations are necessarily suspended and end when such "pollution condition" or "indoor environmental condition" has been remediated to the point at which the "insured's" normal operations could reasonably be restored.

*Id.* at IUIC000009. "Business interruption loss" includes (1) "business income"; (2) "extra expense"; and (3) "delay expense", as those terms are defined in the Policy. *Id.*

## ARGUMENT

### A.     Standard on Motion to Dismiss

Under FRCP 12(b)(6), a court must dismiss a complaint if it fails to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). Although the court must accept the plaintiff's well-pled factual allegations as true and in a light most favorable to the plaintiff, *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir. 1983), dismissal is warranted where it appears the plaintiff cannot prove any "set of facts in support of the claim that would entitle it to relief." *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir. 2000). The Court "[is] not bound to accept as true a legal conclusion couched as a factual allegation" in the plaintiff's complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). In addition, mere "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).

"A court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). In addition, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Tunac v. United States*, 897 F.3d 1197, 1207 (9th Cir. 2018) (alteration in original). The Policy qualifies as a document whose contents are alleged in the Complaint and whose authenticity is not in question. Accordingly, the Court may consider the Policy on Illinois Union's Motion to Dismiss.

### B. <u>Arizona Law Applies</u>

A federal court sitting in diversity will apply the choice of law rules of the forum. *Nelson v. Int'l Paint Co.*, 716 F.2d 640, 643 (9th Cir. 1983). Arizona applies the most significant relationship test under the Restatement (Second) of Conflict of Laws, absent a contractual choice-of-law provision. *Cardon v. Cotton Lane Holdings, Inc.*, 173 Ariz. 203, 207 (1992). "[T]he location of the insured risk should be given the greatest weight when determining which state's law applies, so long as the risk can be located, at least principally, in a single state." *Labertew v. Chartis Prop. Cas. Co.*, 363 F. Supp.3d 1031, 1036 (D. Ariz. 2019). In addition, "Arizona has a strong interest in applying Arizona law." *Beckler v. State Farm Mut. Auto. Ins. Co.*, 195 Ariz. 282, 289 (Ct. App. 1999).

The Policy does not contain a choice of law provision, so the Restatement's most significant relationship will apply to determine choice of law. London Bridge is headquartered in Arizona and the Resort is located there. In addition, the Policy was issued to London Bridge in Arizona. Since the most significant relationship is with Arizona, Arizona law applies to the determination of coverage and whether London Bridge's Complaint states a viable claim for relief under FRCP 12(b)(6).

### C. <u>Arizona Rules of Insurance Policy Interpretation</u>

Under Arizona rules of insurance policy interpretation, London Bridge has the burden to establish that it is entitled to coverage under Insuring Agreement A of the Policy. *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, 46 (Ct. App. 2000) ("Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion."); *757BD LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 330 F. Supp. 3d 1143, 1149 (D. Ariz. 2018) (same).

Arizona courts "interpret an insurance policy according to its plain and ordinary meaning, examining it from the viewpoint of an individual untrained in law or business." *Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 225 Ariz. 194, 200 (Ct. App. 2010). Any ambiguities are construed against the insurer. *Id.* "Undefined terms of an insurance policy ... must be construed in their plain, ordinary and everyday sense and the

parameters of the definition should reflect the legal characteristics most frequently attributed to the word." *Fall v. First Mercury Ins. Co.*, 225 F. Supp.3d 842, 847 (D. Ariz. 2016) (alteration in original). When interpreting an insurance contract, Arizona courts must "harmonize all parts of the contract ... by a reasonable interpretation in view of the entire instrument." *Aztar Corp. v. U.S. Fire Ins. Co.*, 223 Ariz. 463, 475 (Ct. App. 2010) (alteration in original).

### D. The Complaint Fails To Allege a "Pollution Condition" Under the Policy

A "pollution condition" under the Policy is defined as the **"*discharge, dispersal, release, escape, migration, or seepage*** of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant… on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater." (Ex. A at IUIC000014-15) (emphasis added).

While no Arizona court has addressed coverage under a premises pollution liability policy like the Policy at issue here, the terms contained in the Policy's definition of "pollution condition" have been addressed by Arizona courts in the context of an absolute pollution exclusion in a commercial general liability policy and have been found to be unambiguous. In *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 786-87 (Ariz. Ct. App. 2000), which involved application of such an absolute pollution exclusion, the insured, a mixed-use residential and golf community, sought coverage under a commercial general liability policy for a lawsuit brought by a golfer who became ill after ingesting bacteria-contaminated water. In relevant part, the policy excluded coverage for bodily injury "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." *Id*. at 788. The policy defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." *Id*. at 789. The court recognized that terms such as "discharge," "dispersal," "release," and "escape," are *"terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste."* *Id*. at 790 (emphasis added). The court also

recognized the historical purpose of the absolute pollution exclusion, which was to eliminate coverage for traditional environmental pollution. *Id*. at 791. As such, the court found that the policy's pollution exclusion did not apply to exclude coverage for bacteria, since bacteria was not a "pollutant." *Id*. at 792.

Similarly, in *Starr Surplus Lines Ins. Co. v. Star Roofing, Inc.*, 2019 WL 5617575 (Ariz. Ct. App. Oct. 31, 2019), the court recognized that "the terms used in the [pollution] exclusion clause, such as 'discharge,' 'dispersal,' 'release' and 'escape,' *are terms of art in environmental law and are generally used to refer to damage or injury resulting from environmental pollution*.") (Emphasis added). As such, the court held the policy's pollution exclusion did not exclude coverage for injuries sustained due to inhalation of fumes from roofing materials. *Id*. at *3. See also, *Nat'l Fire Ins. Co. of Hartford v. James River Ins.*, 162 F. Supp. 3d 898, 908 (D. Ariz. 2016) (with respect to pollution exclusion, the terms "must be read in light of the historical purpose of the pollution exclusionary clause—as interpreted by the Arizona Court of Appeals—to preclude coverage for 'traditional environmental pollution.'"); *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1216 (Cal. 2003) (court held that the pollution exclusion's scope was limited to "environmental pollution … consistent with the choice of terms 'discharge, dispersal, release or escape.'"); *Am. States. Ins. Co. v. Koloms*, 687 N.E.2d 72, 81 (Ill. 1997) (Illinois Supreme Court limited the scope of the absolute pollution exclusion to traditional environmental pollution); *Nav-Its, Inc. v. Selective Ins. Co. of Am.*, 183 N.J. 110 (2005) (absolute pollution exclusion applies to traditional environmentally related damages; *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377 (2003) (same); *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27 (1st Cir. 1999) (same).

In fact, insurance policies such as environmental impairment and pollution liability policies, that are specifically issued to cover environmental contamination, were intended to fill coverage gaps created by the absolute pollution exclusion's exclusion of coverage for traditional environmental pollution. See *Masonite Corp. v. Great Am. Surplus Lines Ins. Co.*, 224 Cal. App. 3d 912, 916–17 (Ct. App. 1990) (environmental impairment liability

policy filled the gap in coverage resulting from the pollution exclusion in general liability policy to protect insured for damage caused by gradual pollution); *Viacom Int'l, Inc. v. Admiral Ins. Co.*, No. L-1739-99, 2006 WL 1060504, at *2 (N.J. Super. Ct. App. Div. Apr. 21, 2006). ("Environmental Impairment Liability (EIL) policies respond to loss arising from pollution. EIL policies are often viewed as filling the coverage gap created by the pollution exclusion clauses in CGL policies."); *Olin Corp. v. Ins. Co. of N. Am.*, 986 F. Supp. 841, 844 (S.D.N.Y. 1997) ("a substitute form of insurance appeared in the marketplace specifically designed to fill in the gap created by the pollution exclusions in the CGL policies. This new form of insurance was environmental impairment liability (EIL) insurance.") While no Arizona court has addressed coverage under an environmental impairment or premises pollution liability policy, a court in the neighboring state of California has considered the question. In *Essex Walnut Owner L.P. v. Aspen Specialty Ins. Co.*, 335 F. Supp. 3d 1146 (N.D. Cal. 2018), the U.S. District Court for the Northern District of California analyzed the term "pollutant" within the context of a coverage grant in an environmental legal liability policy. The insured sought coverage under the policy for costs incurred to remove debris buried in the insured's excavation site where it intended to build a mixed-use development. *Id*. at 1149. "The debris consisted of wood, concrete, glass, metal, tires, and large, buried tree trunks." *Id*. However, the court found that pollution coverage was limited to "environmental pollution." The policy at issue contained the following relevant definitions:

> Pollution condition means the discharge, emission, seepage, migration, dispersal, misdelivery, release or escape, or illicit abandonment by a third-party without the insured's consent of any pollutant into or upon land, or any structure on land, the atmosphere or any watercourse or body of water including groundwater, provided such pollutant is not naturally present in the environment in the concentration or amounts discovered.
>
> Pollutant means any solid, liquid, gaseous or thermal irritant or contaminant, including without limitation smoke, vapors, soot, silt, sediment, fumes, acids, alkalis, chemicals, hazardous substances, petroleum hydrocarbons, low level radioactive matter or waste, microbial matter, legionella pneumophila, medical, infectious or

pathological waste or waste materials, methamphetamines, electromagnetic fields, biological agent or nanotechnology matter

Clean-up cost means reasonable and necessary expense incurred with the insurer's prior written consent, including legal expense and restoration cost, to investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of contaminated soil, surface water or groundwater or other contamination caused by a pollution condition but only: (i) to the extent required by environmental law ….

*Id.* at 1148-49.

The court found the same general principles from *MacKinnon*, *supra*, 73 P.3d at 1205, applied to limit pollution coverage to "environmental pollution":

[T]he basic teaching of *MacKinnon*—namely, that "pollutant" should be understood to mean something that is commonly thought of as pollution, i.e., environmental pollution—logically applies even in the context of the case at bar. *MacKinnon's* interpretation comports fully with the title of the insurance policy here— "Environmental Legal Liability Policy". It is also consistent with the examples of "pollutant" provided in the policy (e.g., smoke, hazardous substances) and with other policy provisions; in particular, the policy provides that Aspen will pay for "clean-up cost" which the policy defines as an expense incurred to, e.g., address contamination caused by a pollution condition "to the extent required by *environmental* law" or "as determined reasonable and necessary by an *environmental* professional." Since Aspen's liability under the policy is tied to "environmental" matters, it is only logical that "pollutant" likewise be defined as relating to environmental matters.

*Id.* at 1152-53 (citations omitted). Accordingly, although the dispositive issue before the court on summary judgment was whether "clean-up costs" were incurred, the court nevertheless posited: "The question is thus whether the kind of debris allegedly found here in the soil is commonly thought of as environmental pollution." *Id*. at 1153.

Arizona law is clear that the unambiguous terms "discharge," "dispersal," "release," "escape" and similar terms contained in the definition of "pollution condition" in the Policy relate solely to traditional environmental contamination, and do not cover a virus such as COVID-19. This is wholly consistent with the evolution of pollution liability coverage. This interpretation also gives effect to the definition of "pollution condition" in its plain, ordinary and everyday sense, with "the parameters of the definition … reflect[ing] the legal

characteristics most frequently attributed to the word[s]." *Fall v. First Mercury Ins. Co.*, 225 F. Supp.3d at 847.

Moreover, this interpretation is also consistent with the Arizona rule of insurance policy interpretation requiring the court to give effect to all provisions of the Policy. *Aztar Corp. v. U.S. Fire Ins. Co.*, *supra*, 223 Ariz. at 475. Similar to the pollution policy at issue in *Essex Walnut*, *supra*, 335 F. Supp. 3d 1146, the Policy's other terms and definitions demonstrate that coverage is limited to environmental contamination, and there is no coverage for a virus like COVID-19. For example, the Policy defines "remediation costs" as "expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize 'pollution conditions' … to the extent required by 'environmental law'". "Environmental law" is in turn defined as "any Federal, state, commonwealth, municipal or other local law, statute, ordinance, rule, guidance document, regulation, and all amendments thereto (collectively Laws), including voluntary cleanup or risk-based corrective action guidance, or the direction of an 'environmental professional' acting pursuant to the authority provided by any such Laws, along with any governmental, judicial or administrative order or directive, governing the liability or responsibilities of the 'insured' with respect to a 'pollution condition'". These definitions relate to traditional environmental pollution and do not encompass a virus like COVID-19. Accordingly, London Bridge has not met its burden to show that there is a "pollution condition" under the Policy's insuring agreement, and its Complaint must be dismissed with prejudice under FRCP 12(b)(6).

E. **The Complaint Fails To Allege A Pollution Condition On, At, Under or Migrating From a "Covered Location"**

Notwithstanding that COVID-19 is not a "pollution condition," the Complaint does not allege a cognizable claim for coverage under the Policy. Separate and apart from the requirement that there be a "pollution condition," the "pollution condition" must be ***on, at, under or migrating from a 'covered location.'*** (Ex. A at IUIC000014-15) (Emphasis

added"). This requirement that the "pollution condition" be tied to the "covered location" is an essential part of the coverage afforded by a pollution liability policy. See *Jane St. Holding, LLC v. Aspen Am. Ins. Co.*, 2014 WL 28600, at *7 (S.D.N.Y. Jan. 2, 2014), *aff'd*, 581 F. App'x 49 (2d Cir. 2014) (no business personal property coverage for flood damage done to electric generator located in basement when policy's Schedule Location Endorsement limited coverage to 33rd floor of building); *Dilmar Oil Co. v. Federated Mut. Ins. Co.*, 986 F. Supp. 959, 978 (D.S.C. 1997) (no coverage for "voluntary clean-up costs" because they were not incurred at the "insured site", as required by the insuring agreement); accord *Penton Media, Inc. v. Affiliated FM Ins. Co.*, 245 F. App'x 495, 500 (6th Cir. 2007) (civil authority provision of business interruption policy, which covered loss due to prohibition of access to "described locations," did not cover losses arising from insured's postponement of trade show at Javits Center; the court found that the Javits Center, a property not owned by the insured, was not a "described location" contemplated by the civil authority provision).

However, the Complaint does not contain a single allegation that COVID-19 was discovered "on, at, under, or migrating from" the "covered location," which is the Resort in Arizona. Instead, the Complaint alleges that London Bridge's business has suffered as a result of various governmental actions in Arizona and throughout the United States in response to the pandemic that have affected travel to the Resort.

Specifically as to Arizona, the Complaint alleges that the Governor of Arizona issued Executive Order 2020-09 on March 19, 2020 in response to the global pandemic, the State of Emergency declared by President Trump, and updated guidance from the United States Centers for Disease Control and Prevention ("CDC") and Arizona Department of Health Services ("ADHS") regarding social gatherings and in-person restaurant dining. (Complaint at ¶ 19). The Complaint alleges that Executive Order 2020-09 required that, by the close of business on March 20, 2020, all restaurants, bars, and indoor gyms and fitness clubs in counties within Arizona with confirmed cases of COVID-19 to close access to in-person dining. *Id.* at ¶ 20.

The Complaint also alleges that by Executive Order 2020-18 dated March 30, 2020, the Governor of Arizona issued another executive order instituting a "stay at home" policy for Arizona and requiring businesses that remained open to implement rules and procedures to facilitate social distancing. *Id.* at ¶ 23. London Bridge alleges that, "[a]s a consequence of the Pandemic (including specifically damage to property caused by the coronavirus), Executive Order 2020-09, Executive Order 2020-18, and "Closure Orders" (defined below) in other states, London Bridge has suffered Covered Losses under the Policy." *Id.* at ¶ 23.

The Complaint fails to allege that COVID-19 was discovered on, at, under or migrating from the Resort. The general presence of COVID-19 in the same county where the Resort is located, in Arizona, or elsewhere in the United States does not meet the Insuring Agreement's requirement of a "pollution condition" <u>*at, on, under or migrating from a "covered location."*</u>. As such, London Bridge cannot satisfy its burden of establishing coverage under Insuring Agreement A of the Policy, which is fatal to its Complaint. *Aztar Corp. v. U.S. Fire Ins. Co.*, *supra*, 223 Ariz. at 475.

Even more, giving effect to all provisions of the Policy as required by Arizona law, *Aztar Corp. v. U.S. Fire Ins. Co.*, *supra*, 223 Ariz. at 475, there is no coverage for London Bridge's alleged "business interruption" loss. "Business interruption" coverage is afforded under the Policy for "the necessary partial or complete suspension of the 'insured's' operations at a 'covered location' for a period of time, which is *directly attributable to a 'pollution condition' ... to which Coverage A. of this Policy applies."* (Ex. A at IUIC000009) (Emphasis added). The "business interruption" period under the Policy extends from the "time that the operations are necessarily suspended and end *when such "pollution condition" ... has been remediated* to the point at which the "insured's" normal operations could reasonably be restored." *Id.* (Emphasis added). Coverage A is confined to the discovery of "a 'pollution condition' *on, at, under or migrating from a 'covered location.'*" The Complaint identifies no discovery of COVID-19 on, at, under or migrating from a "covered location," absent which Coverage A does not apply. Nor does the Complaint identify any "remediation costs", absent which there can be no covered "business

interruption," because coverage for "business interruption" is confined to the period of time during which the insured's normal business operations are suspended because a "pollution condition" on, at, under or migrating from a "covered location" must be remediated.

Accordingly, the Complaint fails to state a claim upon which relief can be granted for this reason as well.

## **CONCLUSION**

For all of the foregoing reasons, Illinois Union requests that its Motion to Dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted under FRCP 12(b)(6) be granted, and that Plaintiff's Complaint be dismissed with prejudice.

DATED this 2nd day of July, 2020.

FORAN GLENNON PALANDECH
PONZI & RUDLOFF PC


By: s/ *Amy M. Samberg*
Amy M. Samberg
Amy L. Stein
400 E. Van Buren Street, Suite 550
Phoenix, AZ  85004
Attorneys for Defendant Illinois Union
Insurance Company, Inc.

## CERTIFICATE OF CONFERAL

The undersigned hereby certifies that, pursuant to D. Ariz. L.R.Civ. 12.1(c), that prior to filing this Motion, counsel for Illinois Union Insurance Company, Inc. notified Plaintiff of the issues asserted in the foregoing motion and that the parties were unable to agree that the pleading was curable in any part by an amended pleading.

FORAN GLENNON PALANDECH
PONZI & RUDLOFF PC


By: s/ *Amy M. Samberg*
Amy M. Samberg
Amy L. Stein
400 E. Van Buren Street, Suite 550
Phoenix, AZ 85004
Attorneys for Defendant Illinois Union Insurance Company, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2020, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Matt Anderson, Esq.
MATT ANDERSON LAW, PLLC
2633 E. Indian School Road, Suite 370
Phoenix, AZ 85016
matt@mattandersonlaw.com
*Attorneys for Plaintiff*

/s/     Brenda Uran