**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| London Bridge Resort LLC, | No. CV-20-08109-PCT-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Illinois  Union  Insurance  Company Incorporated, | |
| Defendant. | |

Pending before the Court is Defendant Illinois Union Insurance Company, Inc.'s ("Defendant") Motion to Dismiss.  (Doc. 8.)  For the following reasons, the Motion is granted.

## BACKGROUND

Plaintiff London Bridge Resort, LLC ("Plaintiff") is a destination resort located in Lake Havasu City, Arizona.  Plaintiff alleges it has suffered severe revenue loss due to the nationwide COVID-19 outbreak.  To recover for these losses, Plaintiff sought coverage under Defendant's Premises Pollution Liability Insurance Policy ("the Policy").  However, Defendant denied coverage under the Policy.

Plaintiff brought this action on May 8, 2020.  Count One of the Complaint alleges that Defendant breached the Policy when it denied coverage.  Count Two of the Complaint seeks a declaratory judgment that COVID-19 losses are covered under the Policy. Defendant moves to dismiss Plaintiff's Complaint in its entirety on the grounds that COVID-19 does not constitute a "pollution condition" under the Policy and, even if it did,

1    Plaintiff did not suffer the requisite losses.

2

## DISCUSSION

3        **I.    Legal Standard**

4        To survive dismissal for failure to state a claim pursuant to Federal Rule of Civil

5 Procedure 12(b)(6), a complaint must contain more than a "formulaic recitation of the

6 elements of a cause of action"; it must contain factual allegations sufficient to "raise the

7 right of relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

8 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  When analyzing a complaint

9 for failure to state a claim, "allegations of material fact are taken as true and construed in

10 the light most favorable to the non-moving party."  *Smith v. Jackson*, 84 F.3d 1213, 1217

11 (9th Cir. 1996).  However, legal conclusions couched as factual allegations are not given a

12 presumption of truthfulness, and "conclusory allegations of law and unwarranted

13 inferences are not sufficient to defeat a motion to dismiss."  *Pareto v. F.D.I.C.*, 139 F.3d

14 696, 699 (9th Cir. 1998).

15        **II.    Analysis**

16        Under Arizona law, interpretation of an insurance contract is a question of law.

17 *Sparks v. Republic Nat. Life Ins. Co.*, 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982).  The

18 purpose of contract interpretation is to determine and enforce the parties' intent.  *Taylor v.*

19 *State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993).

20 Provisions of an insurance contract are construed according to their plain and ordinary

21 meaning from the standpoint of an "average layman who is untrained in the law or the field

22 of insurance." *Liristis v. Am. Fam. Mut. Ins. Co.*, 204 Ariz. 140, 143–44, 61 P.3d 22, 25-26

23 (Ct. App. 2002).  "[A]mbiguity in an insurance policy will be construed against the

24 insurer"; however, this rule applies only to provisions that are "actually ambiguous." *Keggi*

25 *v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, 46, 13 P.3d 785, 788 (Ct. App. 2000)

26 (internal citations and quotations omitted).  If a provision is susceptible to different

27 constructions, a court must first attempt to determine the meaning of the clause by

28 "examining the purpose of the [provision] in question, the public policy considerations

involved and the transaction as a whole." *Id.* (quoting *Ohio Cas. Ins. Co. v. Henderson*, 189 Ariz. 184, 186, 939 P.2d 1337, 1339 (1997). "[I]f the intention of the parties is clear from such a reading, there is no ambiguity." *Harris v. Harris*, 195 Ariz. 559, 562, 991 P.2d 262, 265 (Ct. App. 1999).

> Here, The Policy defines a pollution condition as:
> The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level radioactive waste," "mixed waste" and medical, red bag, infectious or pathological wastes, on, in, into, or upon land and structures thereupon, the atmosphere, surface, water, or groundwater.

(Doc. 8-1 at 15–16.)   The Policy does not specifically define what a "contaminant" or "pollutant" is.

In *Keggi*, the Arizona Court of Appeals analyzed a similar definition in a pollution exclusion clause.   The question the court faced was whether fecal coliform bacteria was a pollutant under the defendant's insurance policy.   199 Ariz. at 46, 13 P.3d at 788.   The court held that the plain language of the exclusion for pollution did not include bacteria and thus the pollution exclusion did not apply.   *Id.* at 50, 13 P.3d at 792.   But, the court went on to hold that even if the language of the policy defining pollution "could be interpreted broadly enough to include 'bacteria,'" "the purpose of the clause, public policy and the transaction as a whole, demonstrate that the language [of the pollution exclusion clause] nevertheless should not be interpreted to preclude coverage for bacterial contamination absent any evidence that the actual contamination arose from traditional environmental pollution." *Id.*

In holding that the pollution exclusion clause only applied to traditional environmental pollution, the *Keggi* court observed that "the exclusion clause appears to describe events, places, and activities normally associated with traditional environmental pollution claims." *Id.* at 48, 13 P.3d at 790.   The *Keggi* court further explained that the history behind exclusion clauses supports the conclusion that they were "intended to

exclude coverage for causes of action arising from traditional environmental pollution." *Id.* at 49, 13 P.3d at 791. "Historically, the pollution exclusion clauses arose in CGL policies in the 1970's, in response to 'the insurance industry's increased concern about pollution claims [attributable to] environmental catastrophes that occurred during the 1960s.'" *Id.* In addition, *Keggi* noted that "[p]ublic policy supports a narrow interpretation of the exclusion so that it does not eviscerate coverage otherwise reasonably expected by the insured." *Id.* at 50, 13 P.3d at 792. The *Keggi* court based this finding on the observation that terms, such as contaminant and irritant, "viewed in isolation [ ] are virtually boundless," making a limiting principle necessary so that pollution exclusion clauses do not go far beyond their intended scope and "lead to [ ] absurd results." *Id.* at 49–50, 13 P.3d at 791–92 (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992)).

Although no Arizona court has addressed coverage under a pollution liability policy, such as the Policy here, the Court finds that the Arizona Supreme Court would apply *Keggi*'s analysis to the Policy. As there is a close connection between the two types of policies, *Keggi*'s analysis logically applies to a pollution liability policy. Historically, pollution liability policies were created to fill the gap created by pollution exclusion clauses. *See, e.g.*, *Olin Corp. v. Ins. Co. of N. Am.*, 986 F. Supp. 841, 844 (S.D.N.Y. 1997) (explaining that environmental impairment liability insurance "appeared in the marketplace specifically designed to fill in the gap created by the pollution exclusion[ ] [clauses]"); *Masonite Corp. v. Great Am. Surplus Lines Ins. Co.*, 274 Cal. Rptr. 206, 208 (Ct. App. 1990) (discussing how an environmental impairment liability policy was created to fill the gap left by pollution exclusion clauses). Based on this close connection, other courts have extended the principles in pollution exclusion clause cases to those involving pollution liability policies. *See, e.g.*, *Colonial Oil Indus. Inc. v. Indian Harbor Ins. Co.*, 528 Fed. Appx. 71, 74–75 (2d Cir. 2013) (relying on cases interpreting pollution exclusion clauses to determine that a pollution liability policy intended to provide coverage for "environmental harm resulting from the disposal or containment of hazardous waste");

*URS Corp. v. Zurich Am. Ins. Co.*, 979 N.Y.S.2d 506, 510 (Sup. Ct. 2014) ("Given the close identity between the traditional pollution exclusion provision and Hudson's pollution coverage provision, it would be logical to conclude that the two clauses share the same purpose and are complementary, with one meant to fill the gap in coverage created by the other.").

Although the public policy concerns for exclusion clauses are slightly different than for coverage policies, the idea that an overly broad definition of pollution could go beyond what is "reasonably expected by the insured" and create absurd results applies to coverage policies too. *Keggi*, 199 Ariz. at 50, 13 P.3d at 792. Recognizing the differences between the two types of policies, a California District Court still extended the teachings from an exclusion clause case to its analysis of a coverage policy, explaining that:

> Unlike *MacKinnon*, which dealt with a pollution exclusion clause, the instant case concerns a pollution coverage clause; this ordinarily would counsel in favor of a broader definition here in the insured's favor. However, the basic teaching of *MacKinnon*—namely, that 'pollutant' should be understood to mean something that is commonly thought of as pollution, *i.e.*, environmental pollution—logically applies even in the context of the case at bar.

*Essex Walnut Owner L.P. v. Aspen Specialty Ins. Co.*, 335 F. Supp. 3d 1146, 1152 (N.D. Cal. 2018). For these reasons, the Court analyzes the Policy through the lens of *Keggi*.

Similar to the clause in *Keggi*, the Policy uses language associated with traditional environmental pollution. For instance, the definition of pollution condition includes the terms "discharge," "dispersal," "release," and "escape," which are "terms of art in environmental law [that are generally] used with reference to damage or injury caused by improper disposal or containment of hazardous waste." *Keggi*, 199 Ariz. at 48, 13 P.3d at 790 (quoting *Sullins v. Allstate Ins. Co.*, 667 A.2d 617, 620–21 (Md. 1995)). The Policy also defines "remediation costs" as "expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize 'pollution conditions' . . . to the extent required by 'environmental law'" and refers to "voluntary cleanup" and "risk-based corrective action guidance" in its definition of "environmental law." (Doc. 8-1 at 12, 16.)

*See, e.g.*, *Keggi*, 199 Ariz. at 48–49, 13 P.3d at 790–91 (finding that similar language confirmed the drafters' intent to apply a pollution exclusion clause to traditional environmental pollution); *Essex Walnut Owner L.P.*, 335 F. Supp. 3d at 1152–53 (finding references to "environmental law" in a pollution coverage clause affirmed that the clause only covered pollutants "commonly thought of as environmental pollution").

Therefore, the question is whether COVID-19, a type of virus, can constitute traditional environmental pollution.  The Court has little trouble concluding that no plausible interpretation of "traditional environmental pollution" includes a virus outbreak. Furthermore, the Court does not find, and the parties do not provide, case law finding that virus outbreaks are considered traditional environmental pollution.  To the contrary, the types of incidents courts have found to be traditional environmental pollution are substantially different than a virus outbreak.  *See, e.g.*, *GrafTech Int'l, Ltd. v. Pac. Emp. Ins. Co.*, 101 N.E.3d 1271, 1272 (Ohio Ct. App. 2017) (exposure to toxic coal-tar pitch at an aluminum manufacturing plant); *Chubb Custom Ins. Co. v. Standard Fusee Corp.*, 2 N.E.3d 752, 762 (Ind. Ct. App. 2014) (perchlorate contamination from facility that manufactured marine flares); *Or. Mut. Ins. Co. v. Seattle Collision Ctr. Inc.*, No. C08-1670JLR, 2009 WL 3067036, at *2 (W.D. Wash. Sept. 18, 2009) (contamination of soil from the release of volatile organic compounds).

Plaintiff argues COVID-19 constitutes traditional environmental pollution because different government agencies include "virus" in the definition of certain contaminants and pollutants.  (Doc. 15 at 8–9.)  However, a virus being considered a "contaminant" or "pollutant" in certain instances does not render a COVID-19 outbreak "traditional environmental pollution."  As the *Keggi* court explained, "[m]any courts that have considered the purpose of the standard pollution exclusion clause have concluded that the clause is intended to preclude coverage for environmental pollution, not for 'all contact with substances that can be classified as pollutants.'"  *Keggi*, 199 Ariz. at 48, 13 P.3d at 790.

Furthermore, a virus outbreak does not closely resemble the enumerated examples

1   provided in the Policy's definition. When general words in a contract are followed by

2   enumerated specific terms, "the meaning of the general terms is presumed to be limited to

3   the enumerated specific terms and to include only those things of the same nature as those

4   specifically enumerated unless a clear manifestation of a contrary intent is apparent."

5   *United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 273, 681 P.2d 390, 425 (Ct.

6   App. 1983). *See also Seifert v. IMT Ins. Co.*, No. 20-1102 (JRT/DTS), 2020 WL 6120002,

7   at \*4 n.6 (D. Minn. Oct. 16, 2020) (finding a party's attempt "to place [COVID-19] in the

8   same category of pollutants as 'smoke, vapor, soot, fumes, acids, alkalis, chemicals, and

9   waste'" to be "unavailing").

10         There is no dispute that Arizona law applies to this claim. For the reasons given

11   above, the Policy covers traditional environmental pollution claims and not the outbreak

12   of COVID-19. Accordingly, Plaintiff fails to state a claim upon which relief can be

13   granted.[1]

14                                       **CONCLUSION**

15         As COVID-19 does not fall within the Policy's definition of "pollution condition,"

16   Plaintiff cannot recover under either Count in its Complaint. Accordingly,

17   ///

18   ///

19

20

---

21   [1] Additionally, Plaintiff requests that the Court take judicial notice of Defendant's Answer in a separate proceeding to highlight a "conflict[] with [Defendant's] position in this case." (Doc. 20 at 1.) Federal Rule of Evidence 201(b) provides that a court "may judicially

22   notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily

23   determined from sources whose accuracy cannot reasonably be questioned." Although matters of public record are proper subjects of judicial notice, a court may take notice only

24   of the authenticity and existence of a particular order or pleading, not the veracity or validity of its contents. *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

25

26         Accordingly, the Court takes judicial notice of the existence of Defendant's Answer in the separate proceeding but does not take notice of the factual assertions in the Answer for the purpose of establishing essential facts in this case. *See, e.g.*, *Reynoso v. Fidelity*

27   *Nat. Title Ins. Co.*, No. 03:13-cv-01600-HZ, 2013 WL 6919666, at \*3–5) (D. Or. Dec. 31, 2013) (refusing to take judicial notice of allegations in a prior complaint, which the moving

28   party considered to be inconsistent with the non-moving party's position taken in the present proceeding, for the purpose of establishing essential facts in a motion to dismiss).

1     **IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss (Doc. 8) is

2   **GRANTED.**   The Clerk of the Court is directed to enter a judgment of dismissal with

3   prejudice.

4     Dated this 4th day of December, 2020.

5

6

7                    G. Murray Snow
                Chief United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28